**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |
|---|---|
| **UNITED MOTORCOACH** ) | |
| **ASSOCIATION, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 08-1648 (ESH)** |
| ) | |
| **MATTHEW J. WELBES,** ) | |
| Acting Deputy Administrator, Federal ) | |
| Transit Administration, United States ) | |
| Department of Transportation, ) | |
| ) | |
| **Defendant.** ) | |

_____

**MEMORANDUM OPINION**

Plaintiff United Motorcoach Association, Inc., has sued Matthew J. Welbes,[1] in his

official capacity as Acting Deputy Administrator of the Federal Transit Authority for the U.S.

Department of Justice, under the Administrative Procedures Act, 5 U.S.C. § 706 ("APA").

Defendant has moved to dismiss based on lack of subject matter jurisdiction, or, alternatively, for

summary judgment.  Based on the record before the Court and for the reasons set forth below,

the motion to dismiss will be granted.

**BACKGROUND**

Plaintiff United Motorcoach Association, Inc. ("UMA") is an association of professional

bus and motorcoach companies that primarily transports passengers for charter, rather than over

fixed routes on regular schedules.  (Compl. ¶ 4.)  Starline Luxury Coaches of Seattle,

Washington ("Starline"), a division of Transportation Demand Management, Inc., is a member of

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), if a public officer named as a party to an action in his official capacity ceases to hold office, the Court will automatically substitute that officer's successor. Accordingly, the Court substitutes Matthew J. Welbes for James S. Simpson.

1

UMA.  (*Id.* ¶ 8.)  Starline sought to provide charter transportation service to fans during the 2008

Seattle Mariners major league baseball season.  However, pursuant to a June 27, 2008 decision

of the Administrator of the Federal Transit Authority ("FTA"), the King County Department of

Transportation's Metro Transit Division ("King County Metro"), a federally funded transit

agency, was granted permission to provide that service under an exemption from the FTA's

charter service regulations, which generally prohibit recipients of federal funding from providing

charter bus service in competition with private sector entities who express interest in providing

the charter service.  (*Id.* at 1.)  Plaintiff therefore has brought suit to challenge this decision under

the APA.

## I.       THE FTA ADMINISTRATIVE SCHEME

Under the Federal Transit Act, 49 U.S.C. § 5301 *et seq.*, the FTA Administrator executes

and administers the federal promotion and funding of local mass transportation services.  *See* 49

C.F.R. §§ 1.45, 1.51 (delegating authority to the FTA Administrator).  The FTA's primary role is

to dispense federal financial resources to support a variety of locally planned, constructed, and

operated public transportation systems throughout the United States, including buses.  *See*

*generally* 49 U.S.C. § 5301(f).

The FTA is charged with regulating federally funded transit agencies receiving FTA

funding to ensure, *inter alia*, that those federally funded assets are not used to compete against

the private sector.  *See generally* 49 U.S.C. § 5301 *et seq.*; 49 C.F.R. Ch. VI.  Of relevance here

is a condition that recipients of FTA funding generally may not "provide charter bus

transportation service outside the urban area in which it provides regularly scheduled public

transportation service."  49 U.S.C. § 5323(d)(1).  The purpose of this provision is:

> to ensure that the [federal] assistance will not enable a governmental authority or an operator for a governmental authority to foreclose a private operator from providing intercity charter bus service if the private operator can provide the service.

49 U.S.C. § 5323(d); *see also* 49 C.F.R. § 604.1 ("49 U.S.C. [§] 5323(d), . . . protects private charter operators from unauthorized competition from recipients of Federal financial assistance under the Federal Transit Laws.").

There are, however, multiple exceptions under which recipients of FTA funding may provide charter service. Recipients may provide charter service if "all registered charter providers [*i.e.*, private sector companies[2]] in the geographic area" agree. 49 C.F.R. § 604.10. Recipients may also provide charter service if, after receiving notice of the service need, no registered charter provider expresses interest in providing such service. 49 C.F.R. § 604.9. In addition, recipients may provide charter service if they have obtained an exception to the charter service regulations from the FTA Administrator. 49 C.F.R. § 604.11.[3]

There are three primary grounds for exceptions. The charter service regulations provide that a recipient of federal assistance may petition the Administrator for "an exception to the charter service regulations to provide charter service directly to a customer for":

(1) Events of regional or national significance;

(2) Hardship (only for non-urbanized areas under 50,000 in population or small urbanized areas under 200,000 in population); or

(3) Unique and time sensitive events (e.g., funerals of local, regional or national significance) that are in the public's interest.

---

[2] A "registered charter provider" is a private charter operator who wishes to receive notification of pending charter service requests directed to federally funded public transit agencies and has registered on FTA's charter registration website. *See* 49 C.F.R. § 604.3(s).

[3] Petitions to the Administrator must include: (1) the date and description of the event; (2) the type of service requested and the type of equipment; (3) the anticipated number of charter service hours needed; and (4) the anticipated number of vehicles and duration of the event. 49 C.F.R. § 604.11(b). Additional requirements also apply, depending on the type of exception sought. *See* 49 C.F.R. § 604.11(b)(4)(i) (event of regional or national significance requirements), 604.11(b)(4)(ii) (hardship requirements), 604.11(b)(4)(iii) (unique and time sensitive event requirements).

49 C.F.R. § 604.11.  The regulations further provide that the Administrator may grant a "permanent or temporary exemption from FTA rules as allowed by law."   49 C.F.R. § 601.32(a).

The Administrator reviews petitions for exceptions and issues a written decision denying or granting the request in whole or in part.  49 C.F.R. § 604.11(c).  In reaching a decision, the Administrator "may seek such additional information as the Administrator deems necessary."  *Id.* Any exception granted under the charter service regulations "shall be effective only for the event identified . . . ."  49 C.F.R. § 604.11(d).  Final decisions and orders of the Administrator are subject to judicial review.  49 C.F.R. § 604.50; *see also* 5 U.S.C. §§ 701-706.

## II.    THE FTA ADMINISTRATOR'S APRIL 29 AND JULY 27, 2008 DECISIONS

For the past ten years, King County Metro, a federally subsidized transit service operated by local government, provided public transit service for fans riding to and from Seattle Mariners home baseball games.  (A.R. § III, No. 1; Compl. ¶ 8.)  Under the prior regulations, such service was not considered charter service because it was controlled by the transit agency as opposed to a third party, was open to the public, and was widely advertised.  However, pursuant to the newly amended charter service regulation, King County Metro's Mariners service constituted "charter service."[4]  Thus, effective April 30, 2008, King County Metro could no longer provide this transportation service if a private registered charter provider expressed interest in providing the same service unless it obtained an exception from the charter service regulations.  *See* 49 C.F.R. § 604.9(b).

---

[4] Under the current regulations, "charter service" is defined as including "[t]ransportation provided by a recipient at the request of a third party for the exclusive use of a bus or van for a negotiated price."  49 C.F.R. § 604.3(c)(1).  Under the former regulations, "charter service" was defined as including "transportation using buses . . . of a group of persons who pursuant to a common purpose, under a single contract, at a fixed charge . . . have acquired the exclusive use of the vehicle or service to travel together under an itinerary . . . ."  49 C.F.R. § 604.5(e), 52 Fed. Reg. 11933, Apr. 13, 1987.

On March 31, 2008, King County Metro petitioned the Administrator for an exception that would allow it to provide charter transportation services for the entire 2008 Mariners baseball season, or, alternatively, for a ninety-day exception "to allow for some reasonable transition time for the Mariners and any interested registered private charter service providers to negotiate and implement a replacement service."  (A.R. § III, No. 1.)  In support of its petition for a "unique and time sensitive event" exception, King County Metro explained that the first home game of the 2008 Mariners season was on March 31, 2008, that King County Metro had previously entered into a contract with the Mariners to provide charter service, and that King County Metro's charter service had already been "widely" advertised to the public.  (*Id.*; *see also* A.R. § III, No. 2 (clarifying that King County Metro's March 31, 2008 request sought application of the "unique and time sensitive event" exception under 49 C.F.R. § 604.11(a)(3)).)

On April 29, 2008, the Administrator denied King County Metro's petition, finding the Mariners baseball games did not satisfy the "unique and time sensitive event" exception.[5]  (A.R. II, No. 1.)  The Administrator did, however, grant King County Metro a sixty-day exception to "either consult[] registered charter providers in support of a petition for an exception for an event of regional or national significance or issue a notice to turn over all of the service to an interested registered charter provider."  (*Id.* at 2.)  The Administrator also required King County Metro to submit a compliance plan.  (*Id.*)  The sixty-day period was to expire on June 30, 2008.

On May 5, 2008, King County Metro submitted its compliance plan, which stated that on May 2, 2008, King County Metro had issued a "Notice of Charter Service Request" detailing the Mariners charter transportation service needs and providing registered charter providers fourteen days to express interest in operating the service to Mariners home games.  (A.R. § III, No. 3.)

---

[5] As the Administrator explained, "Mariners baseball games do not qualify as events which are unique" because they "happen every year at the same time and with the same frequency."  (A.R. § II, No. 1.)

In response to the notice, Starline expressed interest in providing the charter service for the remainder of the Mariners 2008 season.  (A.R. § IV, No. 1.)  Although Starline and the Mariners corresponded regarding the provision of charter service, they were unable to reach a final agreement.  (*See* A.R. § III, Nos. 4-6, 7, at 2; *id.* at § IV.)

On June 25, 2008, King County Metro again filed a petition for an exception to the charter service regulations for the remainder of the 2008 Mariners season pursuant "either to the Administrator's discretion," or to "49 C.F.R. § 604.11(a)(1) for events of regional or national significance."  (A.R. § III, No. 7, at 1.)  The petition stated that King County Metro had engaged "in protected and good faith efforts to facilitate negotiations between the Mariners and interested party providers, primarily Starline," and it worked "closely with regional and national FTA representatives both to keep them informed of the ongoing efforts to establish a suitable private transportation service" and "to seek their assistance and guidance in implementing the new Charter Service Regulations vis-à-vis the Mariners service and other significant event services," but "no suitable replacement service has been established."  (*Id.* at 2.)

With respect to Starline, the petition stated that "Starline's ability to provide the necessary equipment to conduct the [Mariners charter] service remains an open question" and that Starline was not "prepared to operate a service of this level and complexity."  (*Id.* at 3.)  The petition asserted that without a "viable private charter service replacement," the public would be without game day bus service," and further argued that an exception allowing King County Metro to provide charter service for the remainder of the season would serve the public interest by preventing "the transportation related confusion and disruptions that would result if game day service is allowed to go unmet."  (*Id.*)

On June 27, 2008, the Administrator granted King County Metro's petition for an exception "throughout the remainder of the Mariners' season," including any postseason games. (A.R. § II, No. 2.)  The Administrator noted the petition's failure to meet the technical requirements for the "event of regional or national significance" exception,[6] but found that it did qualify as a "unique and time sensitive event" exception.  (*Id.* at 3.)  The Administrator noted that the parties had "attempted to utilize the initial 60-day extension to reach a negotiated businesslike arrangement for private charter service company participation" without success. (*Id.*)  Based on the parties' positions, the Administrator concluded that such an agreement would not be reached in the foreseeable future and therefore the sports fans would be without service if an exception did not issue.  (*Id.*)  The Administrator therefore found that it was "in the public interest to grant an exception to [King County Metro] for a unique or time sensitive event so that service to the Mariner's games may continue . . . . because FTA will not leave the public without transportation at this late date and with little or no notice to them of its unavailability."  (*Id.*)  The Administrator issued the exception "on a time sensitive basis because the public would not have sufficient notice regarding the cessation of shuttle services to the Mariners games."  (*Id.*)

In his opinion, the Administrator "strongly encourage[d]" the parties to reconsider their negotiating positions so that the public and their business interests could be better served.  (*Id.*) The Administrator stated that he expected the parties to "work within this regulatory environment to anticipate and meet the public's transportation needs" and noted that there were several upcoming events, at which King County Metro had previously provided charter service, for which planning should be underway to assure that alternative service would be provided. (*Id.*)  Finally, the Administrator cautioned that the "FTA will not look favorably upon any

---

[6] Specifically, the Administrator found that the petition failed to "explain how private charter service providers have been incorporated into a plan to provide transportation to an event of regional or national significance," as required under 49 C.F.R. § 604.11(b)(4)(i).  (A.R. § II, No. 2, at 3.)

argument that time does not permit reaching a reasonable solution within the parameters of the [charter service] regulation."  (*Id.* at 3-4.)

## III.    THE PRESENT ACTION

On September 26, 2008, two days before the end of the Mariners season, plaintiff filed this lawsuit, alleging that the Administrator's June 27, 2008 decision granting an exception for the remainder of the season were "arbitrary, capricious, an abuse of discretion, and not otherwise in accordance with the law," under the Administrative Procedures Act, 5 U.S.C. § 706(2)(A). (Compl. at 11.)  Plaintiff's complaint requests that "King County Metro be enjoined from offering charter service at Mariners games."  (*Id.*)  The complaint further requests that this Court permanently set aside and annul the Administrator's decision so that it may not be "used as precedent in the many cases that would follow."  (*Id.*)

Defendant has now moved to dismiss based on a lack of subject matter jurisdiction, arguing that since the King County Metro's exception has expired, this action is moot and any argument regarding the future is not ripe.  As explained more fully herein, the Court agrees.

## LEGAL ANALYSIS

## I.    STANDARD

Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001) (stating that a court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority").  When reviewing a motion to dismiss pursuant to Rule 12(b)(1), a court must accept as true all

factual allegations contained in the complaint and afford the plaintiff the benefit of all favorable inferences that can be drawn from the alleged facts. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993). However, "'plaintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." *Grand Lodge*, 185 F. Supp. 2d at 13-14 (quoting 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, 2d ed., § 1350); *see also Citizens for Responsibility & Ethics v. Cheney*, 593 F. Supp. 2d 194, 209-10 (D.D.C. 2009). A court may consider materials outside the pleadings to determine whether it has jurisdiction. *Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005); *Amons v. District of Columbia*, 231 F. Supp. 2d 109, 113 & n.5 (D.D.C. 2002) (noting that "the court may take judicial notice of matters of a public nature, such as court records, without converting the motion to dismiss into one for summary judgment") (citation omitted).

## II.    CASE OR CONTROVERSY

Article III of the United States Constitution empowers federal courts to entertain disputes only when they are deemed to be "Cases" or "Controversies." U.S. Const. art. III, § 2. "Three interrelated justiciability doctrines – standing, ripeness, and mootness – ensure that federal courts exercise jurisdiction only when the case-or-controversy requirement is met." *Isenbarger v. Farmer*, 463 F. Supp. 2d 13, 19 (D.D.C. 2006). This case implicates both ripeness and mootness considerations by being "premised on future contingencies and thus unfit for judicial review (ripeness) while, at the same time, leaving nothing for the Court to remedy (mootness)." *Id.* at 21-22.

### A.  Mootness

"Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies."  *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983).  The case or controversy requirement "means that, throughout the litigation, the plaintiff must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision."  *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (internal quotation marks omitted).  "Even where litigation poses a live controversy when filed, the [mootness] doctrine requires a federal court to refrain from deciding it if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future."  *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (internal quotation marks omitted); *see also 21st Century Telesis Joint Venture v. Fed. Commc'n Comm'n*, 318 F.3d 192, 198 (D.C. Cir. 2003) (explaining that a court must evaluate mootness "through all stages" of the litigation to ensure a live controversy remains).  An intervening event may render a claim moot if there is no reasonable expectation that the conduct will recur.  *Pharmachemie B.V. v. Barr Labs., Inc.*, 276 F.3d 627, 631 (D.C. Cir. 2002).  "Simply stated, a case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome."  *Larsen v. U.S. Navy*, 525 F.3d 1, 3 (D.C. Cir. 2008).

In this case, plaintiff requests that "King County Metro be enjoined from offering charter service at Mariners games" and further requests that this Court permanently set aside and annul the Administrator's June 27, 2008 decision as arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the law, under the Administrative Procedures Act, 5 U.S.C. §

706(2)(A), so that the decision may not be "used as precedent in the many cases that would follow."  (Compl. at 11.)

Plaintiff stipulates that its request to enjoin King County Metro from providing charter service to Mariners games was mooted when the temporary exception allowing King County Metro to operate the service expired at the conclusion of the 2008 Mariners baseball season on September 28, 2008.[7]  (*See* Pl.'s Opp'n at 13-14; Pl.'s Proposed Order.)  Plaintiff's claim for injunctive relief will therefore be dismissed as moot.  *See McBryde v. Comm. to Review Circuit Council Conduct & Disability Orders*, 264 F.3d 52, 55 (D.C. Cir. 2001) ("If events outrun the controversy such that the court can grant no meaningful relief, the case should be dismissed as moot.").

For similar reasons, the Court will decline plaintiff's request to issue an order setting aside the Administrator's decision, since it would not have any tangible legal effect on the rights of the parties in this case.  *See Iron Arrow*, 464 U.S. at 70 (explaining that the relief sought must be capable of redressing the alleged harm to constitute a live controversy).  The Administrator's decision afforded King County Metro an exception to provide charter service through the remainder of the 2008 Mariners season.  The exception expired on September 28, 2008, the date of the last Mariners home game, and by regulation, the Administrator's decision had *no* further effect beyond that date.[8]  *See* 49 C.F.R. § 604.11(d) ("Any exception granted by the

---

[7] The last home game of the Mariners 2008 season was on September 28, 2008.  *See* Official Website of the Seattle Mariners, 2008 Mariners Schedule, http://seattle.mariners.mlb.com/schedule/index.jsp?c_id=sea&m=9&y=2008.

[8] Plaintiff contends that the Administrator is now "obligated to follow" the "general legal principles" espoused in the June 27, 2008 decision in reaching future decisions, and, therefore, an annulment of the June 27 decision will "greatly affect the rights of the litigants in the case," by preventing the decision from being "used as precedent in the many cases that would follow."  (Pl.'s Opp'n at 14, 19; Compl. ¶ 11.)  This argument, which is addressed more fully with respect to the issue of ripeness, ignores the fact that the Administrator's decision provided a one-time exception, which ended with the conclusion of the 2008 baseball season, and thus has no continuing effect.  *See Spencer v. Kemna*, 523 U.S. 1, 18 (1998)

Administrator under this section shall be effective only for the event identified . . . .").  Thus, an order from this Court to annul the Administrator's decision would provide no tangible relief to the parties in this case.[9]  *See Fund for Animals v. Mainella*, 335 F. Supp. 2d 19, 23-24 (D.D.C. 2004) (holding that challenge to the 2003 black bear hunt became moot when the 2003 hunting season ended).

Nor does this case fall within the narrow exception to the mootness doctrine for those cases that are "capable of repetition yet evade review."  *See Alliance for Democracy v. Fed. Election Comm'n*, 335 F. Supp. 2d 39, 44-46 (D.D.C. 2004).  The "capable of repetition, yet evading review" exception applies only in exceptional circumstances where both of the following elements are satisfied: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again."  *Weinstein v. Bradford*, 423 U.S. 147, 148-49 (1975); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983).

Plaintiff has made no such showing here.  While there may be no dispute as to the first prong of this exception (*see* Def.'s Reply at 12 n.11), plaintiff cannot satisfy the second prong, for it cannot establish a "reasonable expectation or demonstrated probability that the same controversy will recur involving the same complaining party."[10]  *Spirit of the Sage Council v.*

_____

(explaining that the federal courts "are not in the business of pronouncing that past actions which have no demonstrable continuing effect were right or wrong").

[9] Plaintiff also argues that annulment of the Administrator's decision would provide relief to plaintiff because "[a] number of causes of actions would lie against [King County Metro] to disgorge them of the illegal net profit they received in violation of federal law."  (Pl.'s Opp'n at 21.)  However, plaintiff does have standing to pursue such claims.  Here, unlike *Liner v. Jafco*, 375 U.S. 301 (1964), plaintiff has no legal right to recover monetary damages should the Court determine that the charter exception was wrongly issued.  *See* 49 U.S.C. § 5323(d)(2)(C) (no private cause of action against FTA recipients).

[10] Contrary to plaintiff's argument, the law is clear that the harm must affect the complaining party, not some third party. The Court has "no power" to "decide questions that cannot affect the rights of the

*Norton*, 411 F.3d 225, 230 (D.C. Cir. 2005) (internal quotation marks omitted); *see also PETA,*

*Inc. v. Gittens*, 396 F.3d 416, 423 (D.C. Cir. 2005); *Isenbarger*, 463 F. Supp.2d at 23.  The

Administrator's decision arose from a unique set of circumstances.  The charter service

regulations were amended approximately one month before the start of the Mariners baseball

season.  The King County Metro, which had provided charter service to the Mariners games for

the previous ten years under the prior regulations, had already advertised its 2008 season charter

service to the public.  And, despite its efforts, the Mariners had failed to finalize an agreement

with a new private charter service provider prior to the conclusion of the baseball season.  In

short, the issue presented – whether it was arbitrary and capricious for the Administrator to issue

a temporary exception under the specific factual circumstances of this case – will *never* arise

again.  *See Armstrong v. Fed. Aviation Admin.*, 515 F.3d 1294 (D.C. Cir. 2008) (challenge to

FAA's emergency determination was mooted because "the issue presented – whether it was

arbitrary and capricious for the Administrator to make an emergency determination under the

specific factual circumstances of this case – will never arise again"); *PETA*, 396 F.3d at 424

(D.C. Cir. 2005) (declining to apply exception to a "legal controversy so sharply focused on a

unique factual context").

Thus, plaintiff has failed to establish that defendant's alleged wrong satisfies the limited

"capable of repetition, yet evading review" exception to mootness.  Far from settling a claim

between the parties, an order by this Court setting aside the Administrator's decision would

amount to nothing more than an advisory pronouncement that the FTA's past opinion was

somehow contrary to law.  This Court has no "power to render advisory opinions [or] . . . to

decide questions that cannot affect the rights of the litigants in the case before them." *Nat'l*

---

litigants in the case before them." *Nat'l Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 349
(D.C. Cir. 1997).

*Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 349 (D.C. Cir. 1997); *see City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (explaining that where the challenged conduct ceases and "there is no reasonable expectation that the wrong will be repeated, . . . it becomes impossible for the court to grant any effectual relief whatever to the prevailing party, . . . [and] any opinion as to the legality of the challenged action would be advisory") (internal quotation marks and citations omitted).

In sum, this matter is moot, and to the extent that any contrary argument exists, the case is not, as discussed herein, ripe for adjudication.

### B.  Ripeness

Ripeness is a justiciability doctrine designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Worth v. Jackson*, 451 F.3d 854, 861 (D.C. Cir. 2006) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1976), *abrogated by Califano v. Sanders*, 430 U.S. 99 (1977)).  The ripeness doctrine prevents "piecemeal, duplicative, tactical and unnecessary appeals which are costly to the parties and consume limited judicial resources." *Mount Wilson FM Broadcasters v. Fed. Commc'ns Comm'n*, 884 F.2d 1462, 1466 (D.C.Cir.1990) (citing *Cobbledick v. United States*, 309 U.S. 323, 325-26 (1940)).

In evaluating ripeness, the Court undertakes a twofold analysis, evaluating "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs.*, 387 U.S at 149.  Under the first prong, the Court considers "whether the issue is purely legal, whether consideration of the issue would benefit from a more

concrete setting, and whether the agency's decision is sufficiently final." *Nat'l Ass'n of Home Builders v. U.S. Army Corp of Eng'rs*, 440 F.3d 459, 464 (D.C. Cir. 2006).  Under the second prong, the Court considers "whether postponement will impose an undue burden on the claimant or would benefit the court." *Id.* at 464.

Applying these standards, the Court concludes that plaintiff's complaint must be dismissed as unripe.  With respect to the "fitness of the issues" prong, the issues involved in FTA decisions are not purely legal but necessarily depend on unique factual circumstances related to the parties, the nature of the charter service, the type of event, the public's interest, and the urgency of the situation.  Given these considerations, it is wise to defer any review until the question arises in a more concrete form.  *See Worth*, 451 F.3d at 861 (courts should not entangle themselves in "abstract disagreements over administrative policies").

Moreover, plaintiff has not shown a hardship "sufficiently direct and immediate as to render the issue appropriate for judicial review at this stage." *Alascom, Inc. v. Fed. Commc'ns Comm'n*, 727 F.2d 1212, 1217 (D.C. Cir. 1984) (quoting *Abbott Labs.*, 387 U.S. at 152).  Although plaintiff argues that its members will be harmed if the Administrator exercises his authority to grant future exemptions that allow publicly funded transit agencies to provide competitive charter services (*see* Pl.'s Opp'n 16-17), that claim rests upon "contingent future events that may not occur as anticipated or may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998); *see also Devia v. Nuclear Regulatory Comm'n*, 492 F.3d 421, 425 (D.C. Cir.2007) ("[I]f a plaintiff's claim . . . depends on future events that may never come to pass, or that may not occur in the form forecasted, then the claim is unripe.").

Plaintiff's argument relies on a string of hypotheses that (1) a federally funded public transit agency will seek to provide charter service in the future; (2) a registered charter service

provider and member of UMA will express interest in providing the charter service, (3) the

federally funded public transit agency will apply for an exception, (4) the Administrator will

grant the requested exception, and (5) in doing so, the Administrator will rely upon his June 27,

2008 decision.  Although perhaps this could happen, such injury is at this point purely

speculative and cannot form the basis of a proper challenge.[11]  *See Texas*, 523 U.S. at 300 (action

seeking declaratory judgment as to impact of the Voting Rights Act on state-appointed

management teams for school districts was unripe because appointment of such teams was

contingent on a number of factors); *Am. Historical Ass'n v. Nat'l Archives & Records Admin.*,

310 F. Supp. 2d 216, 229-30 (D.D.C. 2004) (researchers' claim that the executive branch

improperly withheld presidential records was unripe, where the records were released to the

public during the pendency of the suit and lack of future access to records was speculative).

Furthermore, plaintiff's assertion that the Administrator will rely on its June 27, 2008

decision to grant a future exception is undermined by the regulatory framework and by the

Administrator's own statements to the contrary.  First, plaintiff cannot point to one instance in

the past eleven months where the Administrator has relied upon its rationale in the June 27

decision to grant an exception in another case, much less one involving a UMA member.

Second, the charter service regulations clearly provide that exceptions are to be granted by the

Administrator on a case-by-case basis after due consideration of the facts, 49 C.F.R. § 604.11(c),

and that exceptions cannot extend beyond their terms.  49 C.F.R. § 604.11(d).  And, finally, in

granting the June 27 exception, the Administrator warned that the FTA "will not look favorably"

upon future arguments that "time does not permit reaching a reasonable solution within the

---

[11] Thus, plaintiff also fails to establish standing by demonstrating that its members will have a concrete
stake in any future decision that relies upon the June 27, 2008 decision.  *See Judicial Watch Inc. v. Fed.
Election Comm'n*, 180 F.3d 277, 278 (D.C. Cir. 1999) (holding that a plaintiff who merely seeks a
judicial pronouncement that someone violated the Federal Election Commission Act fails to satisfy the
Constitution's jurisdictional requirements).

parameters of the [charter service] regulation."  (A.R. § II, No. 2, at 3-4; *see also id.* at 3

(instructing parties to "work within this regulatory environment to anticipate and meet the

public's transportation needs").)

The Court therefore concludes that plaintiff's claim for relief is not "of sufficient

immediacy and reality" to warrant an annulment of the Administrator's June 27, 2008 decision.

*Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941).  The claim is thus unripe,

thereby depriving the Court of any authority to decide this case.  *See Nat'l Park Hospitality*

*Ass'n v. Dep't of Interior*, 538 U.S. 803 (2003) (finding lack of jurisdiction where case is

unripe); *see also Spirit of the Sage Council*, 411 F.3d at 230.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** defendant's motion to dismiss and

dismiss plaintiff's complaint with prejudice.  A separate Order accompanies this Memorandum

Opinion.


_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge


Date:   May 5, 2009